Last case this morning is 417-0921, Inter-Aid Guardianship of Denise Ray Sanders. For the appellant is Amy Peterson, you are she, ma'am? Yes. Okay, and no appearance for the appellee, so you may proceed. Thank you. May I please have a call? Counsel. My name is Amy Peterson, and I represent Denise Sanders, the 24-year-old ward in this adult guardianship case. Denise was 18 years old when the guardianship was established, and her mother was appointed her guardian. At that time, the trial court ordered, without a petition by either party for visitation, by either parent, ordered that Denise have extensive contact with her father and set the order to align with the guidelines of Livingston County, which are established for minors in dissolution proceedings. You're looking at a panel of appellate court judges who have had extensive experience as trial judges beforehand. So I'm curious, given what you just said, where did this idea for this order come from? I assume that the order came from the fact that the parents are divorced, and as such. But no one asked the judge to impose this order? There was no petition in the record. Can you explain why the court thought this was necessary or appropriate? At the time, he said that he thought it was in the best interest of the ward to have extensive contact with her father. That's pretty much all he said. And I take it the ward doesn't necessarily mind visiting her father. It's just she didn't want to do it on a regular schedule and be required to do it. That is correct, Your Honor. She does wish to maintain a relationship with her father, and she's been doing so. She just doesn't want to be forced to see him at set times as a child would be. She's an adult. She wants to be treated as such. If you were to prevail, would she still be seeking a limited guardianship? I think they go hand-in-hand, the limited guardianship, as well as terminating the forced visitation. So, yes, she would be seeking that right to make her own decision as to when she sees her father. Well, if this court were to agree with you that the trial court had no authority to enter an order requiring visitation, do you need any further relief than that? I don't specifically need any further relief. If this court were to say that the trial court cannot order visitation under these circumstances. Just reverse that order. Then the family could go about their business because the guardianship, I guess there would still be a limited guardianship for a person in the state. Is that what we have? It's only of the person. Of a person. Okay. And that's really, other than this visitation order, that's really not being contested, is it? The? The guardianship of a person. No. Okay. Sorry, Your Honor, we're not contesting the actual guardianship. I'm curious. It looks like there's a new statute which will specifically prohibit the court from entering the kind of order that you are appealing now. That is correct. It's really not necessary for part of this case, but just because I'm curious. Was your agency or what was the incentive for the legislature to come up with this and pass the statute? Was your agency involved? My agency was not involved, Your Honor. But that particular amendment that goes into effect on January 1st fits the precise nature of the case that we have before us. The board has the capacity. The board does not want the forced visitation. And under that analysis, clearly the order would be removed, requiring Denise to see her father at set times. Other than the trial judge in this particular case, are you aware of any other court that under similar orders? My agency has never seen a case where an adult ward was forced to visit, was required to visit a parent. There have been some cases in domestic relations cases and a few guardianships where there were agreements between the parties and the ward that visitation would happen. That's a different situation than the case here. Go ahead. Give you an opportunity to address this further. I wanted to address the limited guardianship first. And under that statute, we sought to modify the duties of the guardian here. We presented the testimony of Dr. Ingram, who is a University of Illinois clinical psychologist. She has 30 plus years of working with individuals with developmental disabilities, treating them, evaluating them. She found unequivocally that Denise has a capacity to make her own decision about who she spends time with and what they do. The court found that there was no evidence that Denise's condition had changed since 2012. And that simply was not borne out by the facts. The court also found that limited guardianship was unworkable. And that is not only not the legal standard. The legal standard is whether clear and convincing evidence is produced that the individual has the capacity to perform the tasks necessary for the care of her person. In this case, for setting visitation or when she will see her father. And that standard was clearly met here. Both the guardian ad litem as well as the guardian both support limited guardianship in this situation. And referring to 2012, it's against logic that someone doesn't change from 2012 to 2018. Particularly here, she was 18 years old. Now she's 24 years old. She clearly has grown and developed and matured during this time. And there was a lot of evidence to that point. The trial court had no basis for disregarding the expert's conclusions here. He pointed to the IQ testing of Denise. And the expert herself testified that IQ testing is not determinative of someone's capabilities. And to focus on IQ testing obscures the strengths of someone and gives a false impression many times. Her report specifically stated that intelligence is a general mental ability that represents the global capacity of an individual to act purposely, think rationally, and deal effectively with her environment. It is important to note that actual intelligence is much more than what is measured and represented by an IQ score. This assessment serves as an estimate of Denise's overall intelligence. So she clearly explained that IQ testing was not the answer. The American Psychiatric Association and DSM-5 also does not use IQ testing to determine someone's level of intellectual disability. There's four levels of intellectual disability. Denise has a mild, the lowest level of intellectual disability that there is. And the association finds that it's adaptive functioning that really matters, as the expert also explained. The courts like cherry-picking out of the report of the expert what to follow, the IQ test results, and what to disregard, which were her conclusions, and that really can't stand. And Counselor, just so we're clear, we're talking about a young lady who was able to hold on a job, handled her own finances to a certain extent, paid her bills, did all of those things really without assistance. She does, Your Honor. She takes taxis to places that she wants to go from her home. Her mother attests to how she really functions very independently in her household. Her mother does not make every single little decision that there is for Denise. Denise is quite capable of doing that on her own. And she volunteers for her community in various aspects. She is now working full-time. She's quite capable in many ways. Still at Arby's or somewhere else? No, she's not at Arby's anymore. She now has a full-time job. It's at the Kankakee County. It's a workshop. But she's doing very well. She's meeting new people. She's expanding her horizons. Do we still use the definition of sub-average intellectual functioning with an impairment in adaptive behavior? For someone in one of those four categories? Well, hers is the lowest category. Mild? Mild intellectual disability is what the expert claims that she has. But the condition for which... The DSM is at five now? Yes. Does it define, and whether this is still the appropriate usage of the word, the levels of mental retardation or mental disability? It does define... Profound, severe? Yes. Moderate, mild? That's correct. And does the definition of the condition itself, with the four categories or four levels, is the definition, you start with the idea, sub-average intellectual functioning, in parentheses, at whatever level, with an impairment in adaptive behavior? Yes, it's adaptive functioning that determines what level you are at. It is the adaptive? Yes, that is what the DSM-5 uses and the American Psychiatric Association says. It's adaptive functioning and not IQ test scores. Right. So the trial court was not presented with any other expert, no medical testimony, no other medical expert to say anything to the contrary about Denise's condition. So this was uncontradicted evidence that she does have the capacity to make these decisions. There was other evidence in the record of her capacity, not only Denise's testimony in camera, that she sets up these visits by calling her dad. Both the guardian and the father corroborated that she facilitates these visits in their testimony. The GAL and the guardian reports to the court cite Denise's growth and her maturity over time. She was changing. She was growing and learning and changing from 2012. She was not in the same condition then. When the guardianship was established, the disability was established by stipulation. So there wasn't a lot of discussion in any event about what Denise's actual condition was. But it's critically important that there was no evidence whatsoever from the other side contesting that Denise did not have the capacity. How far is Naperville from her home? Naperville, I believe, is about an hour and 15 minutes from her home in Dwight. Because he kept taking her there for visitations when it interfered with work and all other activities. Yes, Your Honor, and the guardian asked her not to do that. I asked him not to do that. I got the impression that there was a certain amount of hostility between the guardian and the father and that some of the activities that he, for lack of a better word, forced the petitioner to engage in were simply because he had the power to do that. I believe that is right, Your Honor, yes. That's what it appears. It didn't stop him. His response during his testimony, why are you taking her to Naperville, he said, well, it doesn't say in the order I don't have. And he knew it was difficult for her to get to her appointments and other things and to work. And he just, it was more of a concern about what he wanted and what his power was over Denise instead of what's good for Denise and what Denise wants. To maybe follow up then on a question that was asked at the very outset, all of this was presented to the trial judge. That is correct, Your Honor. So what happened? What happened? Yes, why did the trial judge change the court's thinking on this? That's a very good question. I wish I knew. So I cannot answer that. Because there was just nothing on the other side. This is a very one-sided situation, factually. And I don't understand how the court came to the conclusions that it did based on the evidence. I think that was the problem. So limited guardianship, again, we think is established clearly by the court's convincing evidence of record. It will promote her independence to be able to make these decisions by herself for the purposes of establishing a guardianship in the first place. Well, let me expedite this, Ms. Peterson. Okay. Conferring with my colleagues, we're very familiar with all of this. And we appreciate the situation. And we don't take this action often, but you, in your brief, have convinced us. And we are going to reverse the trial court's determination that the court has the authority to enter that order. And we will enter an order in due course, very quick, as a matter of fact, determining the trial court had no authority to order court-ordered visitation. And given the question I asked you earlier, that should be the end of the matter. And we will see to it that that written judgment and order gets entered promptly, and you can inform your clients and everybody else. Thank you so much. Thank you. We'll be in recess.